### PRINTUP *et al. v.* PATTON & JACKSON.

1. The admissions contained in an answer of the defendant, made and filed by him in another case, are admissible in evidence against him when pertinent to a question involved in the case on trial.

2. Such admissions together with other evidence may show that defendant was owner of the ferry at the time the tort sued for was committed. But as the admissions related to a time a year or two previous to the tort, they alone were not sufficient to charge him as owner.

3. A receipt signed by the father of defendant acknowledging that a sum of money had been paid to him by the administrator with the will annexed of a former owner of the ferry upon a judgment, is not relevant where the question is as to defendant's liability for

a tort committed by the ferryman several years after the date of the receipt.

4. The opinion of a witness that the ferryman was not as careful as he should have been, is not admissible evidence.

5. Under the code, ?690, the owner of the land on which a public ferry is situated, unless the ownership of the ferry be separated from that of the land, is liable for negligent torts committed by the ferryman in the performance of his duties as such, whether the owner object to the use of the ferry or not. In order to avoid responsibility to the public he must prevent his ferry from being used as a public ferry by a tenant of the land, or at least show that he did all in his power to prevent it.

6. One of several owners of a ferry, unless he pleads the non-joinder of his co-owners, is liable for a negligent tort committed by the ferryman. But where there is no evidence from which the jury could possibly find such joint ownership, no charge to the jury on that subject is appropriate.

7. The appointment of an administrator with the will annexed is not necessarily void because an executor had previously been duly qualified and letters testamentary issued to him. The executor may have resigned or been removed before the administrator was appointed.

8. Where one pays the consideration for the purchase of land and causes the conveyance to be made to his brother, an intended gift is probable, and consequently a trust will not necessarily result.

9. The court erred in not granting a new trial.

March 27, 1893. Argued at the last term.

Before Judge MILNER. Gordon superior court. February term, 1892.

This was an action by Patton & Jackson against H. S. Printup, J. C. Printup and R. S. Talley, for damages from the drowning of a horse by alleged negligent management of a ferry-boat on the Oostanaula river. Pending the suit H. S. Printup became insane, and his name was stricken and the case proceeded against the other two defendants. There was a verdict in favor of the plaintiffs for $175, and the defendants' motion for a new trial was overruled.

The declaration alleges, that the defendants were proprietors running and using for tollage and profit a public ferry known as Printup's ferry, and were the owners of the land on each side of the ferry and river-

bank, and had advertised that all persons non-residents of Gordon county had the privilege of crossing the ferry only by paying the customary fees charged by ferries; that plaintiffs were residents of Walker county, and on February 4, 1888, came to the ferry travelling in a buggy with two horses, and paid the defendants twenty-five cents to be ferried over, but defendants told them to enter the ferry-boat with their conveyance at a time when the boat was in no way attached or fastened by chain or otherwise to the river-bank, nor to anything else, but was floating loose, all of which was unknown to plaintiffs who, trusting to the care and prudence of defendants, attempted to drive upon the boat; and that just as they were entering and before they had got thereon, the boat floated off from the bank, throwing plaintiffs and their horses into the river. The Printups pleaded to the jurisdiction, on the ground that they were residents of Floyd county. They also pleaded not guilty; that the plaintiffs contributed and consented to the injury, and could by ordinary care have avoided it; and that these defendants, the Printups, were not so connected with the ferry and its management and control as to become liable for the damages. Talley pleaded to the jurisdiction, alleging that the ferry belonged to the Printups who resided in Floyd county, while the ferry was located in Gordon county. He further pleaded that he was only a hired ferryman under a contract with the Printups as to his compensation for his services as ferryman, viz., the Printups to have $60 out of the gross profits made from the ferry; that he (Talley) made a contract with the county commissioners to pass over the ferry any and all citizens of Gordon county for $160, reserving the right, both under the contract with the Printups and the county commissioners, to charge any and all persons other than citizens of that county the usual rates of toll; and that the plaintiffs, being

citizens of Walker county, did not come within the purview of the contract made with the county of Gordon, but were charged ferryage as other persons who did not reside therein.

The testimony for the plaintiffs shows that on an afternoon in February, 1888, about sundown, Jackson, his wife and servant-girl approached the ferry driving a double-seated buggy with two horses, and called Talley, who was in charge of the ferry-boat, to ferry them over the river; that he placed the boat in readiness, and after fastening it as Jackson supposed, told him to drive on. Jackson did so, but as the horses got upon the boat and before the wheels of the buggy were on it the boat shot out from the bank, plunging the buggy into the river and dragging in the horses, one of which was washed under the boat and drowned, and the other saved by cutting the harness. Jackson and the women jumped out, seeing the danger, as the buggy reached the edge of the water from the bank. The horse was worth $200. Talley was holding the boat with a stick under one corner, but turned it loose while the horses were getting on the boat and before the buggy reached it. The team was perfectly gentle, and after he told Jackson to drive on, the latter supposed that all was right. The next morning he noticed that the stob to which the boat ought to have been fastened, was almost covered with mud; did not notice it the evening before. When he crossed next morning he offered to pay Talley, who said he would not charge anything as Jackson had had so much bad luck. Jackson did not examine the condition of the boat but confided in the ferryman.

For the defendants the testimony was, that the river was up two or three feet, and rising. Talley fastened the boat to the third or fourth stob from the low water stob. The stob was eighteen or twenty inches long and was driven into the earth, leaving about five inches

above the ground. It was five inches square at the top and tapered downward, and was such a stob as is usually had for the purpose. It was high enough above the ground to make it entirely safe to fasten to. Around it was wrapped several times a chain attached to the boat, and this chain was made fast to the stob by running one link through another and fastening it with an iron hook. The further or outer end of the boat was fastened by throwing a rope or wire attached to that end over the rope or wire used to pull the flat across by, and was to prevent that end from being carried down by the current. Talley then took a pole or stick used for the purpose, and plunged it into the ground at the right-hand corner of the boat to keep it from moving. The boat was fastened and held to the bank for Jackson to cross on it, in such way as ferry-boats on the river are usually fastened. Talley then took position on the corner and told Jackson to come ahead. Jackson could see how the boat was fastened and that the river was up and rising, and he started the horses forward. They seemed scared and were reluctant to go upon the boat, but Jackson urged them forward. The women jumped out fifteen or twenty feet from the water, while Jackson continued to urge the horses forward, and they continued to shy, slip and pull back, but finally got to the boat. In going they passed over the chain, thereby shaking it loose from the stob, and entered the boat so near the corner where Talley was standing with the pole, that he was forced to leave his position and run further upon the boat to save himself.

The following also was in evidence: Talley testified that he rented the ferry for 1888 from Dunn, who said he was agent of J. C. Printup, and agreed to give him $60 for its use; paid him $5 or $6, but did not know what he did with it; did not rent from J. C. Printup. J. J. Printup (uncle of J. C. Printup) was in possession

and ran the ferry a good while before his death, and it had for a long time been known as Printup's ferry. Dunn testified that he agreed with Talley for the use of the ferry for $60 for the year 1888, but did not contract or agree with him as agent of J. C. Printup, who had not authorized witness to rent the ferry, but had told him he would not rent or let it out to any one, or go on any one's bond for it. Witness had no authority to rent or make any agreement with Talley for the use of the ferry as Printup's agent, but had been forbidden by Printup from doing so, and so told Talley when the agreement was made. Witness did not pay Printup any part of what Talley paid for rent of the ferry. J. C. Printup testified that he and H. S. Printup lived in Floyd county when this suit was brought, and that H. S. Printup is the owner of what is known as Printup's plantation and ferry, but neither he nor witness had anything to do with operating the ferry at the time the accident occurred, nor did witness have any interest in the plantation or ferry at that time, nor did he authorize Talley to operate the ferry, nor was he using or operating it for witness or H. S. Printup. Witness is and has been acting as agent for H. S. Printup, and had charge of the plantation and ferry, but never rented or hired the ferry to Talley, and positively refused again and again to do so or to have anything to do with operating and managing it, and refused to go on Talley's bond and so told him in the presence of Dunn and another. No one ever had the right or the authority to rent or lease the ferry for witness or H. S. Printup. Talley was a renter of the plantation, but not of the ferry. Witness never received anything from any one for the rent or hire of the ferry in anyway. H. S. Printup owned the farm and ferry-boat in 1888. Neither witness nor H. S. Printup ever received a cent for hire or rent of the ferry in that year. Witness had no interest in the ferry.

W. H. Dabney testified that J. J. Printup was in possession of the ferry and land for more than seven years, perhaps fifteen or twenty years, before his death.   J. C. Printup is a son of D. S. Printup, a brother of J. J. and H. S. Printup.   E. J. Kiker testified that when he first knew the ferry, over thirty years ago, it was in possession of and operated by J. J. Printup who continued to possess and operate it until his death.   After his death Ellis, executor, Nancy Printup and other legatees under his will, went into possession.

In evidence for the defendants was a deed of Forsyth, administrator *de bonis non* with the will annexed of J. J. Printup, to H. S. Printup, dated December 5, 1882, recorded February 21, 1883, containing recitals of power from the court of ordinary to sell the real estate of J. J. Printup, of advertisement and public sale to H. S. Printup for $4,330, of a number of lots of land in Gordon county, aggregating 1,100 acres.   In rebuttal the plaintiffs introduced, over objection, a paper dated June 26, 1883, signed by D. S. Printup, acknowledging receipt of Forsyth, administrator, etc., of $3,470.17 "on the judgment and decree in favor of myself against said Forsyth as administrator on the estate of Jos. J. Printup, deceased, in Gordon superior court."   The plaintiffs also introduced, over objection of defendants, the answer of J. C. Printup, filed May 28, 1886, to a bill brought by Nancy Printup *et al.* against D. S. Printup, T. M. Ellis *et al.*, in Gordon superior court.   In this answer the respondent denies that he adopted any improper scheme, etc., "to obtain from said Nancy Printup, for herself and as guardian of said Samuel Printup, a deed conveying to him her interest and the interest of said Samuel Printup to the home place described in the second item of the will of said J. J. Printup, deceased, and says that said Nancy Printup made said deed freely and voluntary," etc.   T. M. Ellis testified that he knew of no proceed-

ings in the court of ordinary to revoke the will of J. J. Printup, or remove the executor, that Nancy and George Printup took charge of the ferry, and place after J. J. Printup's death, and that the Printups had possession and used the place and the ferry for a number of years. The ordinary of Gordon county testified that he knew of no proceedings in his court to revoke the probate of the will of J. J. Printup.

The motion for new trial, after setting forth the general grounds, complains that the court erred in admitting in evidence the answer of J. C. Printup above mentioned, over the objections that it was made and filed in a case between different parties and involving different matters from those in this case; that title to the land and ferry could not be proved in that way; and that the evidence was irrelevant. For similar reasons error is assigned upon the admission of the receipt of D. S. Printup to Forsyth, administrator.

A witness testified: "As a ferryman I don't think Talley was careful as he should have been; his carelessness in keeping his stobs in order was such that I called his attention to it." To this testimony the defendants objected on the ground that it only expressed the opinion of the witness, but the objection was overruled.

The following portion of the testimony of J. C. Printup by interrogatories, was excluded, and this is assigned as error: "He desired to operate the ferry as a public ferry under board of commissioners. He spoke to Mr. Dunn about the matter, and Mr. Dunn asked me about it. I replied and told him that I would not have anything whatever to do with the running and operating said ferry in any way whatever, but if Mr. Talley desired to operate same, he could do so by giving the necessary bond; he could operate same at his own expense, but I would not go on his bond, nor in any way be responsible for his acts, nor anything that might

happen; and instructed Mr. Dunn to go to Calhoun and state to the board of commissioners that I would not operate the ferry, would not go on bond of any one and would have nothing to do with its operation in any way, and that it was a matter of indifference to me whether the ferry was operated or not. In coming over the river next morning, in the presence of Mr. J. R. Dunn and J. F. Aycock, I told Mr. R. S. Talley just what I told Mr. Dunn, and I then notified him that I would not be responsible for his acts in any way whatever, and that he could tie up the flat."

Error is assigned on the refusal of the court to charge: " The owner of property, either real or personal, who lets or lends and transfers the entire possession and control of the same to the hirer or renter, is not responsible for any wrongful use or management of the property by the hirer or renter."

After charging that if J. C. Printup controlled the plantation and ferry as agent of H. S. Printup and not for himself, he would not be liable for the use of the boat by a tenant of H. S. Printup, and that if Talley obtained control of the ferry from J. C. Printup as agent of H. S. Printup, J. C. Printup would not be responsible for his conduct, the court added the following charge : "But if you believe from the evidence that J. C. Printup owned said land and ferry, or an undivided interest in the same by purchase, or that his father, Daniel S. Printup, owned the same, and that he died leaving three heirs, and that J. C. Printup is one of said heirs and thereby became the owner of one undivided third interest in said land and ferry, he would be liable the same as said Talley, if you should believe, from the evidence and rules of law that I have given you in charge, that Talley is liable for the loss of the horse, and if you should find against said Printup and not as against said Talley." It is alleged that this qualification of the charge

as first given was not law and was without evidence to authorize it, and that it probably misled the jury.

The court charged the jury, that if they believed "that Jos. J. Printup died leaving a last will and testament, and that the same was admitted to probate in the court of ordinary, and that an executor was qualified and letters testamentary issued to him, and that said probate of said will was unrevoked by proceedings instituted for that purpose in said court of ordinary, then the appointment of C. D. Forsyth as administrator with the will annexed of said J. J. Printup, was void, and the sale of the land by him as such administrator would convey no title, and the deed from him to H. S. Printup would be inoperative to convey title." This is assigned as error, because it was unauthorized by the pleadings and evidence, and was calculated to mislead the jury.

The court charged: "The name of Henry S. Printup having been stricken, the case is proceeding against John C. Printup and R. S. Talley. The first question for your consideration is, whether John C. Printup owned the land and ferry or had an interest in the same at the time of the occurrence. If you believe that John C. Printup owned the land and ferry at the time, or that Daniel S. Printup, the father of John C. Printup, was the real purchaser of the land and paid the purchase money for it, he would be the owner of the land though Forsyth, the administrator of J. J. Printup, gave Henry S. Printup a deed to the same; and if Daniel S. Printup died leaving three heirs and John C. was one of them, then he, John C., would become the owner of an undivided one third interest in the land and would be liable for the loss of the horse, if you should find Talley to be liable. You will then advance to the second question, whether the horse was drowned under such circumstances as would make Talley liable." Similar errors are assigned on this charge as those already set

forth, and it is further alleged that this charge erroneously put the responsibility on J. C. Printup if Talley should be found liable, and presented the case too prominently and strongly against J. C. Printup.

The court charged: "If you believe that Joseph J. Printup had a prescriptive title to the land and ferry, and died in possession of the same, and that John C. Printup became the owner of the same or an interest therein, and was the owner or had an interest therein at the time of the occurrence, he would be liable if the horse was drowned under such circumstances as would make Talley liable." Assigned as error for like reasons as above stated.

DABNEY & FOUCHÉ and E. J. KIKER, for plaintiffs in error.

W. K. MOORE and O. N. STARR, *contra.*

BLECKLEY, Chief Justice.

1–2. As to the competency and effect of admissions made by J. C. Printup in his answer filed in another case, the head-notes speak all that need be said.

3. The alleged tort was not committed by J. C. Printup, but by his codefendant, Talley, who was the ferryman. It was sought to hold Printup liable, if not as employer of the ferryman, as owner or part owner of the land. Whether he was such owner or not was a controverted fact. How a receipt signed by his father, in which he, the father, acknowledged payment of a sum of money on a judgment in his favor, would illustrate this question or any other involved in the case, we are unable to see. That the defendant in the judgment paid the money and was administrator with the will annexed of J. J. Printup, who formerly owned the ferry, seems utterly immaterial. What connection did the judgment, or the payment or the receipt, or Printup's father, have with the ferry or the land on which it was situated?

None whatever, so far as appears. The receipt was several years older than the tort complained of.

4. Jury, not witness, ought to determine whether the ferryman was as careful as he should have been. Negligence is a question of fact dependent upon other facts. Witnesses supply the latter, and from them the jury infer the former, when the inference can properly be drawn.

5. The code, §690, reads thus: "Any proprietor of any bridge, ferry, turnpike or causeway, whether by charter or prescription, or without, or whether by right of owning the lands on the stream, are bound to prompt and faithful attention to all their duties as such; and if any damage shall occur by reason of non-attendance, neglect, carelessness or bad conduct, he is bound for all damages, even if over and beyond the amount of any bond that may be given." We construe this section as stated in the fifth head-note. Where ownership of the ferry is separated from that of the land, the owner of the latter has no control over keeping the ferry open, using it, or the manner of its use. But where he owns the ferry as well as the land, he must keep it closed or take the consequences. He must at least do all in his power to prevent any tenant of the land from using it as a public ferry. The policy of the statute is to protect the public against injuries by careless or incompetent ferrymen who may be too indigent to respond in damages. Another object is, to make it easy for strangers and wayfaring men to ascertain whom to sue in case they are injured. The name and residence of the particular ferryman in whose charge the ferry-boat was when the injury was sustained might be hard to prove; but to whom the ferry or the adjacent lands belonged would generally be widely known in the neighborhood, and readily established. We say this would generally be so, though in the present case the reverse seems to be true.

6. It must be conceded that where ownership of the ferry or the land is the sole ground of liability, and such ownership is in two or more persons jointly, they should all be joined as defendants in the action. But the non-joinder, unless pleaded in abatement, would not defeat a recovery. In the present case, however, there was no adequate evidence of joint ownership, and no charge to the jury on that subject was appropriate.

7. It did not affirmatively appear that the executor of J. J. Printup, deceased, though still living, had not resigned or been removed before Forsyth was appointed administrator with the will annexed. The fact of Forsyth's appointment by the court of ordinary, which had jurisdiction of the subject-matter, implied that there was a vacancy in the office of executor, since, were there not a vacancy, no occasion for such an appointment would have existed. That court, being one of general jurisdiction touching the administration of estates, testate and intestate, every presumption is in favor of the regularity and validity of its judgments. Nothing appeared to impeach this one, save the previous qualification of the executor and the issuing to him of letters testamentary. There was no necessary inconsistency between the two representations of the same estate, one succeeding the other, though the first representative was not yet dead. Had it been shown that he had not vacated the office when Forsyth was appointed, that would have branded the appointment as void.

8. As between husband and wife, parent and child, brother and brother, or sister and sister, payment of the purchase money of land by one of the correlatives, and causing the conveyance to be made to the other, will generally suggest an intention to make a gift. This may or may not prevent a resulting trust, according to the circumstances of the particular transaction. Certainly, a trust for the benefit of the one paying the money does not necessarily result.

9. We are clearly of opinion that the court erred in not granting a new trial.　　*Judgment reversed.*